Per Curiam:
These cases were referred to Trial Commissioner Mastín G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on September 27, 1971. Exceptions to the commissioner’s opinion and report were filed by both parties and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the report of the commissioner with a few modifications, it hereby adopts the same, as modified by the court, as the basis for its judgment in these cases, as hereinafter set forth. Therefore, plaintiff is entitled to recover on its expedited service claims (1), (4), (6), (7), (9)-(12), (16), (18)-(21), (23), (25)-(27), (29), (30), (32), (33), (35), (38), (39), (41), (42), (44), and (48) set out in subparagraph (b) of paragraph YI of the petition in case No. 194-69; on its expedited service claims (2), (3), and (11) set out in sub-paragraph (b) of paragraph VI of the petition in case No. 28-70; on its volume shipment claims (l)-(25) and (31)-(38) set out in paragraph XII of the petition in case No. 194 — 69; and on its volume shipment claims (18)-(22) set out in paragraph XII of the petition in case No. 28-70; and judgment is entered to that effect, with the amounts of the recoveries to be determined in further proceedings pursuant to Rule 131 (c).
*258 Plaintiff is not entitled to recover on the remaining claims asserted in the present litigation, and the respective petitions are dismissed as to such claims.
Commissioner White’s opinion, with a few modifications by the court, is as follows:
These two cases were tried jointly, because they not only involve the same plaintiff but they also involve common questions of fact and law. The basic issues to be decided by the court in each of the two cases have generally been referred to as “the expedited service issue” and “the volume shipment issue.”

I. The Expedited Service Issue

A. Introduction. There are 48 shipments in oase No. 194-69 and 14 shipments in case No. 28-70 which involve the expedited service issue. With respect to these shipments, the plaintiff computed and collected charges under Item 120 of its Tender No. 50,1.C.C. No. 85, or under Item 230 of its Tariff 2-E, MF-I.C.C. No. 15, on the basis that it allegedly had been requested to perform, and had performed, expedited service or high-speed transportation in connection with such shipments. The defendant subsequently assessed and recouped alleged overcharges on the theory that the plaintiff had not been requested to perform, and had not performed, expedited service or high-speed transportation in connection with the 62 shipments that involve this issue.
Item 120 of the plaintiff’s Tender No. 50, I.C.C. No. 85, and Item 230 of the plaintiff’s Tariff 2-E, MF-I.C.C. No. 15, provided in similar language at times material to this litigation that whenever a shipper or consignee requested that a shipment be given expedited service or high-speed transportation, the movement would be subject to a minimum charge based on not less than 20,000 pounds for each vehicle used, at the rate applicable to a 20,000-pound shipment of the commodity or commodities transported. The two items further provided in similar language that each bill of lading on such a shipment should be marked or stamped “Expedited Service,” or “High-Speed Transportation,” or “Priority 1, 2, 3, or 4,” or “any other annotation * * * such as a definite dead *259 line delivery date requiring expedited service or high-speed transportation in order to meet such deadline delivery date.”
None of the Government bills of lading involved in the present litigation was marked or stamped with the term “Expedited Service” or with the term “High-Speed Transportation” ; and there is no evidence in the record relative to the making by the defendant of a specific request that any particular shipment be accorded expedited service or high-speed transportation.
On the other hand, the evidence in the record shows that 44 of the bills of lading involved in the litigation were marked or stamped to indicate that they covered priority 1, 2, or 3 consignments, that two of the bills of lading were marked or stamped to show that they covered priority 4 consignments, that 11 of the bills of lading were marked or stamped with annotations referring to deadline dates, and that five of the bills of lading did not bear any of the annotations specified in the plaintiff’s Item 120 or Item 230.
B. Priority 1, 2, and 3 Consignments. Sometime before the happening of the events which gave rise to the present litigation, the Department of Defense adopted a Uniform Materiel Issue Priority System, which is a system of priorities for the handling throughout the entire procurement cycle, including transportation, of requisitioned items as to which there is an element of urgency in relation to the mission of the requisitioning activity. The system involves the furnishing by the requisitioning activity of an issue priority designator (“IPD”) in connection with each such requisition. The issue priority designators range from 1 through 20; and the higher the number, the lower the priority.
The Uniform Materiel Issue Priority System provides for the assignment of a transportation priority (“TP”) to any material requisitioned with an issue priority designator; and transportation officers are guided by the assigned transportation priorities in selecting appropriate modes of transportation for such material. For example, material requisitioned with issue priority designator 1, 2, or 3 is assigned TP 1. The preferred mode of transportation for TP 1 material is airlift, but TP 1 material may be transported by other high- *260 speed modes when its size or other characteristics — or When good traffic management — indicate airlift to be inappropriate or unnecessary. However, some type of high-speed transportation is desired on a TP 1 shipment.
On March 12,1962, a seminar for persons involved in the transportation of military goods was held in Atlanta, Georgia, and the plaintiff’s general manager was in attendance. During the course of the seminar, the plaintiff’s general manager heard — and received a mimeographed copy of — an address by Major General I. Sewell Morris, Commander of the Defense Traffic Management Service, Department of Defense, in which General Morris (among other things) explained the Uniform Materiel Issue Priority System, and indicated that the system contemplated a general speed-up of transportation procedures and operations, both military and commercial. General Sewell said that each Government bill of lading involved in the system would show a priority number; and that although the priority number would not be of direct interest to the carrier transporting the shipment, it would furnish an indication as to the urgency of the shipment and could be converted into a time factor. There was attached to the mimeographed copy of General Morris’ address a time chart which indicated that if issue priority designator 1, 2, or 3 appeared on a bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be 5 days or Y days, depending on whether the material was consigned to a point in the continental United States or overseas.
After the plaintiff’s general manager attended the seminar that is mentioned in the preceding paragraph, the plaintiff promulgated Item 120 of its Tender No. 50, I.C.C. No. 85, and Item 230 of its Tariff 2-E, MF-I.C.C. No. 15, mentioned earlier in this opinion.
During the period subsequent to March 12,1962, the plaintiff often received complaints from the defendant when the plaintiff (for reasons not explained in the record) failed to provide high-speed transportation meeting the defendant’s standard in connection with shipments requiring such transportation under the Uniform Materiel Issue Priority System.
*261 The facts previously summarized show that the 44 priority 1,2, or 3 consignments involved in the present litigation were regarded by the defendant as transportation priority 1 shipments requiring high-speed modes of transportation in order to effect delivery within a certain maximum time period (including in-transit time), and that the plaintiff was aware of the defendant’s desire for high-speed transportation when it received such shipments for handling.
The evidence further shows that the plaintiff met the defendant’s standard for high-speed transportation, and thus is entitled to recover, with respect to 24 of the transportation priority 1 shipments involved in case No. 194-69 and three of the TP 1 shipments involved in case No. 28-70. These instances are referred to in subparagraphs (1), (4), (6), (7), (9)-(12), (16), (18), (20), (21), (23), (25)-(27), (29), (30), (32), (35), (38), (39), (41), and (48) of paragraph (a) of finding 11, and in subparagraphs (2), (3), and (11) of paragraph (a) of finding 12. (The subparagraph numbers in paragraph (a) of finding 11 match the claim numbers in sub-paragraph (b) of paragraph YI of the petition in case No. 194-69; and the subparagraph numbers in paragraph (a) of finding 12 match the claim numbers in subparagraph (b) of paragraph VI of the petition in case No. 28-70.)
On the other hand, the evidence shows that the plaintiff failed to meet the defendant’s standard for high-speed transportation, and is not entitled to recover, with respect to 15 of the transportation priority 1 shipments in case No. 194r-69 and two of the TP 1 shipments in case No. 28-70. These instances are referred to in subparagraphs (5), (14), (15), (17), (22), (24), (28), (34), (36), (37), (43), and (45)-(47) of paragraph (a) of finding 11, and in subparagraphs (1) and (4) of paragraph (a) of finding 12.
C. Priority 4 Consignments. As stated earlier in this opinion, the Government bills of lading on two of the shipments involved in the present litigation were marked or stamped to show that they related to issue priority designator 4 consignments. Under the Uniform Materiel Issue Priority System, material requisitioned with issue priority designator 4, 5, 6,7, or 8 is assigned transportation priority 2 and is to be *262 moved by an appropriate mode of transportation, which will assure delivery within the requirements of the required delivery date. The time chart which was furnished to the plaintiff’s general manager on March 12, 1962, indicated that if issue priority designator 4, 5, 6, Y, or 8 appeared on a Government bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be 8 days or 15 days, depending on whether the material was consigned to a point in the continental United States or overseas. Thus, the plaintiff was aware that IPD 4 material did not have a top transportation priority requiring high-speed transportation. Under Items 120 and 230, a request (express or implied) from the shipper or consignee for expedited service or high-speed transportation in connection with a shipment was a prerequisite for the assessment of charges under the pertinent item.
The available facts concerning the two IPD 4 consignments involved in the present litigation are set out in sub-paragraphs (2) and (40) of paragraph (a) of finding 11. It will be noted that the plaintiff did not provide high-speed transportation, meeting the defendant’s standard, for either of the two shipments.
It follows, therefore, that the plaintiff is not entitled to recover with respect to the two IPD 4 consignments, since the defendant did not request, and the plaintiff did not provide, expedited service or high-speed transportation in connection with such shipments.
D. Consignments Involving Beadli/ne Dates. The Government bills of lading on 11 of the shipments involved in the present litigation were marked or stamped with annotations indicating deadline dates for the delivery of the respective shipments.
For example, the bills of lading covering the shipments referred to in subparagraphs (31), (33), (42), and (44) of paragraph (a) of finding 11 were marked or stamped “HDD,” followed by a date in each instance. The symbol KDD is an abbreviation for “Required Delivery Date,” and it is placed on a Government bill of lading, with a date, by *263 the origin transportation officer to signify that the material must be delivered not later than the date indicated.
Under the defendant’s standard for the furnishing of high-speed transportation, as discussed in subpart B of this part I of the opinion, the required delivery date fixed by the defendant with respect to the shipment mentioned in sub-paragraph (42) of paragraph (a) of finding 11 required the plaintiff to furnish, and the plaintiff did furnish, high-speed transportation in order to meet the defendant’s deadline. Accordingly, the plaintiff is entitled to recover on this shipment.
On the other hand, the plaintiff did not meet the required delivery dates fixed by the defendant with respect to the shipments mentioned in subparagraphs (31) and (33) of paragraph (a) of finding 11. Consequently, the plaintiff is not entitled to recover on these two shipments.
Subparagraph (44) of paragraph (a) of finding 11 relates to a shipment, having a total weight of 13,530 pounds, from Sheppard Air Force Base, Texas, to Oakland, California, a distance of about 1,622 miles. It was tendered by the defendant to the plaintiff on October 16,1964, with annotations of “ROD :22 Oct 64” and “PRI 2” on the bill of lading. The shipment was delivered by the plaintiff 3 days later. Although the required delivery date was 6 days later than the date on which the shipment was tendered to the plaintiff, the annotation “PRI 2” on the bill of lading was an indication that this was a shipment with a top transportation priority, for which the defendant desired high-speed transportation, and the plaintiff actually provided such transportation by moving the shipment over a distance of 1,622 miles in 3 days’ time. Accordingly, it is my opinion that the plaintiff is entitled to recover on this shipment.
The Government bills of lading on the shipments mentioned in subparagraph (19) of paragraph (a) of finding II and in subparagraphs (5)-(10) of paragraph (a) of finding 12 were each marked or stamped with the annotation “Deadline Date at Port” or “D/L at Port,” followed by a date.
*264 There is evidence in the record presented on behalf of the defendant and indicating that “Deadline Date at Port” or “D/L at Port” is not officially authorized as part of the Defense Department’s transportation terminology, but that it is used sometimes by Defense Department personnel on transportation documents as the equivalent of the authorized term, “Desired Delivery Date” or “D.D.D.” When the symbol D.D.D., with a date, is placed on a Government bill of lading by the origin transportation officer, it signifies the date by which delivery of the material is desired. On the other hand, testimony on behalf of the plaintiff indicated that the plaintiff understood the annotation “Deadline Date at Port” or “D/L at Port” as the equivalent of a required delivery date; and such an understanding seems reasonable in view of the dictionary meaning of the word “deadline,” i.e., “any fixed limit” (Webster’s New International Dictionary (Second Edition, Unabridged, 1955)).
The shipment referred to in subparagraph (19) of paragraph (a) of finding 11 had a total weight of 15,907 pounds, and it was from Defense, Texas, to Oakland, California, a distance of about 1,874 miles. It was tendered by the defendant on July 8, 1964, and the Government bill of lading was marked or stamped “Deadline Date at Port 12 July 64.” In view of the distance over which the shipment was to be moved, a delivery within 4 days in order to meet the defendant’s deadline would obviously require handling of a type that met the defendant’s standard for high-speed transportation. The plaintiff actually provided such transportation by offering the shipment for delivery in Oakland 3 days after it was received. Accordingly, it is my opinion that the plaintiff is entitled to recover on this shipment.
Subparagraphs (5)-(8) of paragraph (a) of finding 12 relate to shipments of passenger automobiles from Defense, Texas, to New Orleans, Louisiana, a distance of about 402 miles. In each instance, the Government bill of lading was marked or stamped “Deadline Date at Port” or D/L at Port,” followed by a date which was 6 days later than the date on which the particular shipment was tendered to the carrier. In view of the relatively short distance of 402 miles over *265 which these shipments were to be transported, the time allowance of 6 days was a plain indication to the carrier that the defendant did not need or desire high-speed transportation. Therefore, although the plaintiff actually delivered one shipment the next day after it was received, and delivered the other shipments 2 days after they were received, it is my opinion that the plaintiff is not entitled to recover on these four shipments, in the absence of any request for expedited service or high-speed transportation from the shipper or consignee. Such a request was an essential predicate for the assessment of a proper charge under Item 120 or Item 230.
The shipments referred to in subparagraphs (9) and (10) of paragraph (a) of finding 12 involved the movement of passenger automobiles from Defense, Texas, to Oakland Army Terminal, California, a distance of about 1,874 miles. Each -of these shipments was tendered to the carrier on September 3, 1964, and the Government bill of lading in each instance was marked or stamped “Deadline Date at Port 11 Sep 64.” Here, again, the circumstance that the defendant allowed 8 days for the movement indicated that these were not shipments having a top transportation priority, and that the defendant did not need or require high-speed transportation. Therefore, although the plaintiff effected delivery of each shipment within 5 days, it is my opinion that the plaintiff is not entitled to recover, since delivery within the comparatively short period was not requested by the shipper or consignee. As previously stated, such a request was essential to the making of a valid charge under Item 120 or Item 230.
E. Other Shipments. The evidence in the record indicates that the Government bills of lading on the shipments referred to in subparagraphs (8) and (13) of paragraph (a) of finding 11, and on the shipments referred to in subparagraphs (12)-(14) of paragraph (a) of finding 12, were not marked or stamped with any of the annotations which, according to Item *120 or Item 230, the plaintiff would regard as a request for expedited service or high-speed transportation. Furthermore, there is no other evidence in the record indicating that the defendant, either expressly or by implication, requested *266 expedited service or high-speed transportation in connection with such shipments.
The Government bill of lading on the shipment referred to in subparagraph (13) of paragraph (a) of finding 11 was marked or stamped with the symbol “T/PRI 2,” indicating that this was a transportation priority 2 shipment. Under the Defense Department’s Uniform Materiel Issue Priority System, material requisitioned with issue priority designator 4, 5, 6,7, or 8 is assigned transportation priority 2 and is moved by means of an appropriate mode of transportation, which will assure delivery within the requirements of the required delivery date. The time chart which the plaintiff’s general manager received on March 12,1962, indicated that the maximum amount of time (including in-transit time) allowed for the movement of such a shipment would be 8 days or 15 days, depending on whether the material was consigned to a point in the continental United States or overseas. Therefore, the appearance of “T/PRI 2” on the bill of lading now under consideration could not reasonably have been construed by the plaintiff as a request for expedited service or high-speed transportation. The same is true of the shipment referred to in subparagraph (3) of finding 11(a), which was annotated “PRI 3, not a request for expedited service or high-speed transportation.”
The Government bill of lading on the shipment mentioned in subparagraph (8) of paragraph (a) of finding 11 was marked or stamped “TP: 3,” indicating that this was a transportation priority 3 shipment. The Defense Department’s Uniform Materiel Issue Priority System provided for TP 3 to be assigned to material requisitioned with issue priority designator 9,10,11,12,13,14, or 15. The time chart on which the plaintiff placed reliance indicated that the maximum amount of time (including in-transit time) allowed for the movement of such a shipment would be 20 days or 45 days, depending on whether the material was consigned to a point in the continental United States or overseas. Obviously, the annotation “TP: 3” could not reasonably have been construed by the plaintiff as a request for expedited service or high-speed transportation.
*267 The Government bills of lading on the shipments referred to in subparagraphs (12)-(14) of paragraph (a) of finding 12 were each marked or stamped with the annotation “TP :4,” indicating that each of these shipments was a transportation priority 4 shipment. Under the Uniform Materiel Issue Priority System, material requisitioned with issue priority designator 16, 17, 18, 19, or 20 is assigned transportation priority 4 (i.e., the lowest possible TP). The time chart on which the plaintiff placed reliance indicated that the maximum amount of time (including in-transit time) allowed for the movement of such a shipment would be 30 or 60 days, depending on whether the material was consigned to a point in the continental United States or overseas. Hence, there was no reasonable basis on which the plaintiff could have regarded these TP 4 annotations as being requests for expedited service or high-speed transportation.
Therefore, the plaintiff is not entitled to recover on the shipments discussed in this subpart E, since there was no request from the shipper or consignee for expedited service or high-speed transportation in connection with any such shipment.

II. The Volume Shipment Issue

The volume shipment issue arose in connection with 44 truckloads of material that are involved in case No, 194 — 69 and 132 truckloads of material that are involved in case No. 28-70. Each truckload was covered by a separate Government bill of lading; and the plaintiff treated each movement under each bill of lading as constituting a separate shipment for the purpose of computing and collecting a charge for the transportation. Subsequently, the defendant assessed and recouped alleged overcharges on the theory that none of these bills of lading covered a separate shipment, but that each bill of lading should have been grouped with an additional bill or bills as together covering a single volume shipment for the purpose of computing and collecting a transportation charge on the basis of the volume rate applicable to the shipment.
*268 The plaintiff relied, and still relies, on Item 270 of its Tender No. 50, I.C.C. No. 85, on the reissue of the same item in the plaintiff’s Tender No. 50A, I.C.C. No. 101, and on Item 560 of the plaintiff’s Tariff 2-E, MF-I.C.C. No. 15. These items provided in similar language as follows:
DEFINITION OF A SHIPMENT
Except as otherwise provided, a shipment is a lot of freight received from one shipper at one point of origin at one time, for one consignee at one destination, and covered by one bill of lading. * * *
On the other hand, the defendant contends that the transactions involving the volume shipment issue should be governed by paragraph 214013 of DSAR Regulation 4500.3. This paragraph covers volume shipments of military goods which require the use of two or more units of transportation equipment. It provides in part that when such a volume shipment “is tendered to a carrier at one time as available for transportation, and more than one bill of lading is required to provide the necessary evidence of receipt by the carrier, delivery to consignee, and other data, each bill of lading so issued, will, for the purpose of protecting the volume rate which applies, be cross-referenced to indicate clearly that it covers a portion of a volume shipment subject to the volume rate which applies to the entire shipment.”
In case No. 19N69, the parties have agreed that the plaintiff is entitled to recover $2,228.26 on the first 25 volume shipment claims involved in that case. Thus, 19 volume shipment claims remain for disposition in case No. 194-69. All 132 of the volume shipment claims in case No. 28-70 must be disposed of by judicial action.
Most of the volume shipment claims remaining for disposition arose out of situations in which a military installation issued two or more Government bills of lading to the same carrier on the same day to cover the movement to the same consignee at the same location of a quantity of material requiring a number of vehicles corresponding to the number of bills of lading, with the first bill in the series stating that *269 it was tbe 1st bill of lading issued to cover a portion of a volume shipment, with, each other bill in the series indicating its proper place in the sequence (2d bill, 3rd bill, etc.) and containing a cross-reference to the bill or bills preceding it, and with the last bill in the series containing the statement that it was the final bill of lading issued to cover the remainder of a volume shipment.
In a situation such as that described in the preceding paragraph, the carrier knew that the entire quantity of material was tendered as a single volume shipment, irrespective of the number of bills of lading issued by the shipping installation on the particular shipment. The carrier also knew that the defendant was asking it to transport the entire quantity as a single volume shipment and subject to the applicable volume rate. By accepting the material for transportation under such circumstances, the plaintiff impliedly agreed to handle it on the basis thus indicated by the defendant in its tender. Accordingly, the plaintiff is now bound by its agreement and is estopped from asserting that such agreement was inconsistent with its own tariff definition of the term “shipment.” It necessarily follows that the plaintiff is not entitled to recover on the volume shipment claims which arose out of transactions that fitted the factual pattern outlined in the preceding paragraph.
Several of the transactions that are involved in the volume shipment phase of the present litigation fitted the factual situation previously described, except that the pertinent bills of lading were not issued on the same day. The transactions in this category are referred to in subparagraph (2) of paragraph (b) of finding 15, and in subparagraphs (2)-(12) of paragraph (c) of finding 15. It should be noted, in connection with this problem, that paragraph 214013 of DSAK Kegulation 4500.3, on which the defendant relies, was applicable to a volume shipment which (among other things) was “tendered to a carrier at one time as available for transportation” (emphasis supplied).
With respect to the several truckloads of material referred to in each of the finding 15 subparagraphs cited in the preceding paragraph of this opinion, the record does not contain *270 any direct evidence on the question of whether the material was or was not tendered to the carrier “at one time as available for transportation.” We merely know that the several bills of lading were not all issued on the same day. This, of course, does not preclude the possibility that all of the material may have been tendered to the carrier at one time as available for transportation, but the carrier was unable to provide the required number of vehicles at that time, with the result that the bills of lading were issued on the respective days when the equipment became available for the transportation of the material. As the plaintiff is seeking to recover in the present litigation, it was the plaintiff’s responsibility to provide the court with evidence upon which it could be determined that, in each of the situations now under consideration, the material was not tendered to the carrier at one time as available for transportation. Since the 'bills of lading which pertain to each of the transactions indicate that the entire quantity of material was tendered by the defendant to the plaintiff as a single volume shipment, and that the defendant therefore impliedly asked the plaintiff to transport the entire quantity subject to the applicable volume rate, it must be concluded under the circumstances that the plaintiff, by its conduct, agreed to handle the material on the basis proposed by the defendant, even though the bills of lading were not all issued on the same date.
Accordingly, the plaintiff is not entitled to recover on the volume shipment claims discussed in the two immediately preceding paragraphs.
Certain of the volume shipment claims arose out of situations that were somewhat different from any of those previously discussed in the opinion. One of these unusual situations is described in subparagraph (1) of paragraph (b) of finding 15. The defendant issued three Government bills of lading on February 14, 1966, four on February 15, 1966, and one on February 16, 1966, to cover the movement of guns from Ft. Chaffee, Arkansas, to Ft. Sill, Oklahoma. The bills were numbered C-4327136-40 and C-4327261-63. None of the first five bills of lading contained any sort of reference to any other bill in the series. However, the sixth bill stated *271 that it was the 6th bill, and contained a cross-reference to the five preceding bills; the seventh bill stated that it was the 7th bill, and contained a cross-reference to the six preceding bills; and the eighth bill stated that it was the final bill, and contained a cross-reference to the seven preceding bills.
Paragraph 214013 of DSAR Regulation 4500.3 contained precise instructions as to how a carrier was to 'be notified that a shipment requiring two or more vehicles, and multiple bills of lading, was being tendered as a volume shipment subject to the applicable volume rate. It declared that the first bill of lading should bear the annotation, “First bill of lading issued to cover portion of volume shipment tendered carrier [on a specified date] comprising approximately [a specified number of] pounds”; that the second (and each succeeding) bill of lading should bear the annotation, “Second [or other appropriate number] bill of lading issued to cover portion of volume shipment tendered carrier [on a specified date] compromising approximately [a specified number of] pounds, the first part of which moved on bill[s] of lading No[s] [followed by the number or numbers of the preceding bill or bills]”; and that the final bill should bear the annotation, “Final bill of lading issued to cover remainder of a volume shipment tendered carrier [on a specified date] comprising [a specified number of] pounds, the first part of which moved on bill[s] of lading No[s] [followed by the number or numbers of the preceding bill or bills].” The applicable regulation was not followed in the transaction referred to in the preceding paragraph; and the plaintiff was not put on notice that it was being tendered a large quantity of guns which it was expected to transport as a single volume shipment at the applicable volume rate. Accordingly, it is my opinion that the plaintiff is entitled to recover on its volume Shipment claims which grew out of such transaction. (Claims 31-38 in paragraph XII of the petition in case No. 194-69.)
Another unusual situation is described in subparagraph (1) of paragraph (c) of finding 15. The defendant issued one Government bill of lading on October 25, 1965, two on October 26, 1965, one on October 28, 1965, and one on Octo *272 ber 29,1965, each, covering the movement of two vehicles from Tooele Army Depot, Utah, to Late City, Missouri. The first bill of lading, C-7804427, did not contain any indication that it was .related in ’any way to the other bills mentioned in the preceding sentence. However, the second bill stated that it was the 2nd bill, and contained a cross-reference to 0-7804427; the third bill stated that it was the 3rd bill, and contained a cross-reference to the two other bills previously mentioned; the fourth bill stated that it was the 4th bill, and contained a cross-reference to the three bills previously mentioned; and the fifth bill stated that it was the final bill to cover a volume shipment, and contained a cross-reference to C-7804427.
In view of the defendant’s failure, under the circumstances outlined in the preceding paragraph, to comply with the provisions of paragraph 214013 of DSAB Begulation 4500.3 by putting the plaintiff on notice at the time of the issuance of the first bill of lading on October 25, 1965, that the defendant was tendering a number of vehicles, which it expected the carrier to transport as a single volume shipment at the volume rate, it is my opinion that the plaintiff is entitled to recover on its claims which grew out of the transaction now under consideration. (Claims 18-22 in paragraph XII of the petition in case No. 28-70.)
By way of summarizing the results of the discussion in part II of this opinion, the parties have agreed that the plaintiff is entitled to recover on the first 25 of its volume shipment claims in case No. 19A-69, and it is my opinion that the plaintiff is entitled to recover on eight additional volume shipment claims in case No. 194r-69 and on five volume shipment claims in case No. 28-70. The plaintiff is not entitled to recover on the other 11 volume shipment claims in case No. 194r-69, or on the other 127 volume shipment claims in case No. 28-70.
FINDINGS on Fact

I. General

1. The plaintiff is a corporation, organized and existing under the laws of the State of Texas, with its principal place of business at Houston, Texas.
*273 2. During the period 1964 to 1966, the plaintiff transported numerous shipments of military cargo at the request of the defendant, either in single line service or as the final and delivering carrier. After delivery of the shipments, and in accordance with the rules and regulations promulgated by the Comptroller General for the settlement of transportation accounts, the plaintiff submitted bills for such services. In accordance with the applicable law, these 'bills were paid as originally stated. Thereafter, in the performance of the statutory audit, the General Accounting Office (“GAO”) disallowed some of the bills in part, and the resulting overcharges were asserted and collected by deductions from balances due the plaintiff on other bills not here in dispute.
3. (a) The issues herein are: (1) the expedited service issue; and (2) the volume shipment issue.
(b) With respect to the expedited service issue, the question presented is whether the defendant requested high-speed transportation on certain shipments, and whether such serviee was rendered by the plaintiff.
(c) With respect to the volume shipment situation, the question presented is whether the defendant is entitled to a lower volume rate on certain shipments.
4. (a) With respect to the expedited service issue in case No. 194-69, if the plaintiff is wholly correct with respect to this issue, the plaintiff is entitled to $9,385.09 on the 48 shipments listed in paragraph VI of the plaintiff’s petition. If the defendant is wholly correct, the plaintiff has been paid in full on these claims and its petition should be dismissed as to such claims.
(b) In case No. 28-70, if the plaintiff is wholly correct with respect to the expedited service issue on the 14 shipments listed in paragraph VI of its petition, the plaintiff is entitled to recover $1,171.49. If the defendant is wholly correct, the plaintiff’s petition should be dismissed with respect to these claims.
(c) Therefore, if the plaintiff is wholly correct with respect to the expedited service issue on the shipments listed in both petitions, the plaintiff would recover a total amount of $11,156.58.
*274 5. (a) In case No. 19-1 — 69, the plaintiff is entitled to recover $2,228.26 on its volume shipment claims Nos. 1 through 25 in its petition, and there is no dispute as to such claims.
(b) In case No. 19N69, if the plaintiff is wholly correct with respect to the volume shipment issue, the plaintiff is due an additional amount of $1,594.99 on its claims Nos. 26 through 44 in the petition.
(c) In case No. 28-70, if the plaintiff is wholly correct with respect to the volume shipment issue, the plaintiff is entitled to recover $17,101.82 on its claims Nos. 1 through 132. If the defendant is wholly correct, the plaintiff’s petition should be dismissed with respect to these claims.

II. The Expedited Service Issm

6. Sometime prior to March 1962, the Department of Defense adopted for the defense establishment a Uniform Materiel Issue Priority System, which is a system of priorities for the handling throughout the entire procurement cycle, including transportation, of requisitioned items as to which there is an element of urgency in relation to the mission of the requisitioning activity. The system involves the furnishing by the requisitioning activity of an Issue Priority Designator (IPD) in connection with each such requisition. The Issue Priority Designators range from 1 to 20; and the higher the number, the lower the priority. Under the system, the 20 Issue Priority Designators are grouped into four groupings. Issue Priority Designators 1, 2, and 3 constitute Issue Priority Group 1; IPD 4, 5, 6, 7, and 8 constitute Issue Priority Group 2; IPD 9,10,11,12,13,14, and 15 constitute Issue Priority Group 3; and IPD 16, 17, 18, 19, and 20 constitute Issue Priority Group 4.
7. (a) The Uniform Materiel Issue Priority System provides for the assignment of a Transportation Priority (TP) to any material requisitioned with an Issue Priority Designator; and transportation personnel in the defense establishment is guided by the assigned Transportation Priorities in selecting appropriate modes of transportation for such material.
*275 (b) Material requisitioned with IPD 1,2, or 3 is assigned TP 1. The preferred mode of transportation for this priority is airlift. TP 1 material may be transported by other high-speed modes when its size or other characteristics — or when good traffic management — indicate airlift to be inappropriate or unnecessary.
(c) Material requisitioned with IPD 4, 5, 6, 7, or 8 is assigned TP 2 and is to be moved via an appropriate mode of transportation, which will assure delivery within the requirements of the required delivery date (EDD).
(d) Material requisitioned with IPD 9, 10, 11, 12, 13, 14, or 15 is assigned TP 3 and is to be moved via ordinary or expedited surface modes of transportation. Normally, movement by airlift will be only under conditions where timely surface transportation is not available to overseas areas or when the only access to the consignee is by air transportation.
(e) Material requisitioned with IPD 16,17, 18, 19, or 20 is assigned TP 4 and is to be moved via ordinary surface modes of transportation. Normally, movement by airlift will be only under conditions where timely surface transportation is not available to overseas areas or when the only access to the consignee is by air transportation.
(f) Paragraph 214043 of DSAE Eegulation 4500.3 states in part as follows:
214043 Special Military Service, Exclusive Use of Carrier Equipment, or Other Special Services, a. Special Military Service. When the responsible routing authority has furnished a complete routing based on a carrier’s tender or on a tariff provision for “Special Military Service” as distinguished from “exclusive use of carrier equipment” under tariff provisions, all copies of the Government bill of lading will carry the following annotation in accordance with the terms of the applicable tender or tariff:
SPECIAL MILITAEY SEEVICE was requested Time of receipt by carrier__ ..
■_______ date ___
(Signature of shipping officer)
Time of delivery__date
(Signature of receiving officer)
*276 The origin transportation officer and destination transportation officer will enter the time and date information and affix their respective signatures.
b. Exclusive Use of Gamer Equipment. When the responsible routing authority has indicated in the route order that the routing is based on the requirement for exclusive use of motor vehicle or railway express equipment, all copies of the Government bill of lading will be annotated “EXCLUSIVE USE OF VEHICLE REQUESTED BY THE GOVERNMENT,” or similar provision when instructed by the routing authority (par. 20200c(6)). The annotation on the bill of lading will be signed by the issuing transportation officer or his de-signee in accordance with Administrative Direction No. 2 on the reverse of the bill of lading. In addition, the following blank indorsement will be shown by the issuing transportation officer on the bill of lading for execution by the carrier’s agent at destination:
I certify that exclusive vehicle service was furnished from______ to ___
(Origin) (Destination)
(Signature of carrier’s agent) (Date)
This indorsement is evidence that the service was performed and services as authorized for payment of higher transportation charges when applicable.
8. (a) The plaintiff’s General Manager was in attendance at the Southeastern Traffic Region’s General Traffic Management Seminar in Atlanta, Georgia, on March 12, 1962. During the course of the seminar, he heard — and received a mimeographed copy of — an address by Major General I. Sewell Morris, Commander of the Defense Traffic Management Service, in which General Morris (among other things) explained the Uniform Materiel Issue Priority System, and indicated that the system contemplated a general speed-up of transportation procedures and operations, both military and commercial. General Sewell said that each Government bill of lading involved in the system would show a priority number; and that although the priority number would not be of direct interest to the carrier transporting the shipment, it would furnish an indication as to the urgency of the shipment and could be converted into a time factor.
*277 (b) There was attached to the mimeographed copy of General Morris’ address a chart which indicated that if priority number 1, 2, or 3 appeared on a bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be either 5 days or 7 days, depending on whether the material was consigned to a point in the continental United States or overseas; that if priority number 4, 5, 6,7, or 8 appeared on a bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be either 8 days or 15 days, depending on whether the material was consigned to a point in the continental United States or overseas; that if priority number 9, 10,11, 12,13,14, or 15 appeared on a bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be either 20 days or 45 days, depending on whether the material was consigned to a point in the continental United States or overseas; and that if priority number 16,17,18,19, or 20 appeared on a bill of lading, the maximum amount of time (including in-transit time) allowed for the movement would be either 30 days or 60 days, depending on whether the material was consigned to a point in the continental United States or overseas.
9. (a) After the plaintiff’s General Manager attended the seminar that is mentioned in finding 8, the plaintiff promulgated Item 120 of its Tender No. 50,1.C.G. No. 85, and Item 230 of its Tariff 2-E, MF-I.C.C. No. 15.
(b) Item 120 of the plaintiff’s Tender No. 50, I.C.C. No. 85, provided as follows:

Expedited Service or High-Speed Transportation

When the shipper or consignee requests expedited service or high-speed transportation, charges shall be assessed on the basis of the applicable rate and actual weight of the shipment, subject to a minimum charge for each vehicle used of 20,000 pounds at the rate applicable to a 20,000-pound shipment of the commodity or commodities transported. On such shipments each bill of lading is to be marked or stamped as follows: “Expedited Service,” “High-Speed Transportation,” “Priority 1, 2, 3, or 4” or any other annotation, (other than “D, D, P,” or *278 “Desired Delivery Date”), such as a definite deadline delivery date requiring expedited service or high-speed transportation in order to meet such deadline delivery date.
The provisions of this item apply on all shipments moving under bills of lading stamped or marked with the annotations described above, regardless of whether such bill of lading does or does not bear a “D. D. D.” or “Desired Delivery Date.” The annotation “D. D. D.,” as used herein, is defined as desired delivery date.
Nothing in this tender shall be construed to require the carrier to meet a “deadline” delivery date, a required delivery date or dates, or to modify its tender or bills of lading provisions in respect thereto.
(c) Item 230 of the plaintiff’s Tariff 2-E, MF-I.C.C. No. 15, provided in part as follows:

Expedited Service or High-Speed Transportation

Except as provided in Items 3390 and 3400, when upon request of shipper or consignee a shipment is given expedited service or high-speed transportation, charges shall be assessed on the basis of the applicable rate and actual weight of the shipment or minimum weight, whichever is greater, subject to a minimum charge based on no less than 20,000 pounds for each vehicle used at the rate applicable to a shipment of 20,000 pounds or greater of the commodity or commodities transported. On such shipments each bill of lading is to be marked or stamped as follows: “Expedited Service” “High Speed Transportation,” “Priority 1, 2, 3, or 4” or any other annotation (other than “D.D.D.” or “Desired Delivery Date”), such as a definite deadline delivery date requiring expedited service or high-speed transportation in order to meet such deadline delivery date.
The provisions of this item apply on all shipments moving under bills of lading stamped or marked with the annotations described above, regardless of whether such bill of lading does or does not bear a “D. D. D.” or “Desired Delivery Date.” The annotation “D. D. D.,” as used herein, is defined as desired delivery date.
Nothing in this tariff shall be construed to require the carrier to meet a “deadline” delivery date, a required delivery date or dates, or to modify its tariff or bills of lading provisions in respect thereto.
*279 (d) During the period subsequent to March 12,1962, the plaintiff often received complaints from the defendant when the plaintiff (for reasons not explained in the record) failed to provide high-speed transportation meeting the defendant’s standard in connection with shipments requiring such transportation under the Uniform Materiel Issue Priority System.
10. (a) There are 62 shipments on which the plaintiff is claiming charges based on its expedited service tariff items quoted in finding 9. None of the Government bills of lading covering these shipments had any annotation specifically requesting special military service, expedited service, high-speed transportation, or exclusive use of a vehicle. However, one Government bill of lading (“GBL”) bore the symbol IPD 01; 23 GBL’s bore the symbol PEI 1; seven GBL’s bore the symbol IPD 02; one GBL bore the symbols IPD 02 and EDD, followed by a date; six GBL’s bore the symbol PEI 2; one GBL bore the symbols PEI 2 and EDD, followed by a date; one GBL bore the word and number PEIOEITY 2; six GBL’s bore the symbol PEI 3; two GBL’s bore the symbol PEI 4; one GBL bore the symbol T/PEI 2; one GBL bore the symbol TP 3; three GBL’s bore the symbol TP 4; two GBL’s bore the symbol EDD, followed by a date; five GBL’s bore the phrase Deadline Date at Port, followed by a date; and two GBL’s bore the symbol D/L at Port, followed by a date.
(b) The term Deadline Date at Port or D/L at Port is not officially authorized as part of the Defense Department’s transportation terminology, but it is used sometimes by Defense Department personnel on transportation documents as the equivalent of the authorized term, Desired Delivery Date (D.D.D.). The symbol D.D.D., with a date, is placed on a Government bill of lading by the origin transportation officer to signify the date by which delivery of the material is desired.
(c) The symbol EDD is an abbreviation for Eequired Delivery Date, and is placed on a Government bill of lading, with a date, by the origin transportation officer to signify that the material must be delivered not later than the date indicated.
*280 11. (a) The following shipments in case No. 194-69 involve the expedited service issue:
(1) 'Shipment of harness, rocket or missile, or parts, total weight of 12,622 pounds, from Vandenberg Air Force Base (“AFB”), California, to Hill AFB, Utah, a distance of about 888 miles, tendered on GBL issued March 13, 1964, with annotation thereon “PM 1”; delivered 3 days later.
(2) Shipment of stands, NOI, O/T furniture, KD O/T flat, total weight of 13,900 pounds, from Oakland, California, to Kelly AFB, San Antonio, Texas, a distance of about 1,742 miles, tendered on GBL issued March 6, 1964, with annotation thereon “PKI: 4”; delivered 6 days later.
(3) Shipment of machines, NOI, S.U., total weight 3,240 pounds, from Kelly AFB, San Antonio, Texas, to Vanden-berg AFB, California, a distance of about 1,516 miles, tendered on GBL issued March 17,1964, with annotation thereon “PKI 3”; no information available concerning time of delivery.
(4) Shipment of tanks, alum., S.U., 18 gauge or thicker, total weight 15,120 pounds, from McClellan AFB, California, to Luke AFB, Arizona, a distance of about 763 miles, tendered on GBL issued March 26,1964, with annotation thereon “IPD 02”; part of shipment delivered 1 day later and remainder 2 days later.
(5) Shipment of one truck and one bus, total weight of 13,735 pounds, from McDill AFB, Florida, to Ontario, California, a distance of about 2,430 miles, tendered on GBL issued April 28, 1964, with annotation thereon “IPD 02”; delivered! days later.
(6) Shipment of freight trailers, total weight of 17,680 pounds, from Norton AFB, California, to Kelly AFB, San Antonio, Texas, a distance of about 1,307 miles, tendered on GBL issued June 3,1964, with annotation thereon “PKI: 1”; shipment delivered 5 days later.
(7) Shipment of aircraft or aircraft parts, total weight of 1,560 pounds, from Tinker AFB, Oklahoma, to Travis AFB, California, a distance of about 1,669 miles, tendered on GBL issued June 17, 1964, with annotation thereon “PKI 2”; delivered 4 days later.
*281 (8) Shipment of freight automobile, NOI, total weight of 13,490 pounds, from Tooele Army Depot, Utah, to Fort Irwin, California, a distance of about 598 miles, tendered on GBL issued June 30,1964, with annotation thereon “TP: 3”; delivered 2 days later.
(9) Shipment of one loose on wheels machine, NOI, total weight of 2,600 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued November 1, 1964, with annotation thereon “PKI/2”; delivered 3 days later.
(10) Shipment of loose on wheels machines, NOI, total weight of 4,260 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued October 31, 1964, with annotation thereon “PKI 2”; delivered 4 days later.
(11) Shipment of air coolers, O/T water, total weight of 7,740 pounds, from Kelly AFB, Texas, to March AFB, California, a distance of about 1,303 miles, tendered on GBL issued November 11, 1964, with annotation thereon “PKI/1”; delivered 5 days later.
(12) Shipment of one loose on wheels machine, NOI, total weight of 3,160 pounds, from Kelly AFB, Texas, to Castle AFB, California, a distance of about 1,631 miles, tendered on GBL issued November 5, 1964, with annotation thereon “PKI 3”; delivered 5 days later.
(13) Shipment of antenna enclosures, NOI, O/T metal, total weight of 593 pounds, from Kelly AFB, Texas, to Castle AFB, California, a distance of about 1,631 miles, tendered on GBL issued July 24, 1964, with annotation thereon “T/PKI2”; delivered 6 days later.
(14) Shipment of machinery parts, NOI, and propeller hubs, total weight of 11,453 pounds, from Sharpe Army Depot, Lathrop, California, to Fort Worth, Texas, a distance of about 1,663 miles, tendered on GBL issued July 15,1964, with annotation thereon “PKI-3”; delivered 6 days later.
(15) Shipment of aircraft parts, total weight of 2,260 pounds, from Kobins AFB, Georgia, to Travis AFB, California, a distance of about 2,568 miles, tendered on GBL *282 issued July 28, 1964, with annotation thereon “IPD 02”; delivered 7 days later.
(16) Shipment of machines, metal washing, total weight of 2,866 pounds, from Kelly AFB, Texas, to Norton AFB, California, a distance of about 1,307 miles, tendered on GBL issued July 28,1964, with annotation thereon “PRI 1”; delivered 3 days later.
(17) Shipment of machines, NOI, SU, total weight of 3,740 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued July 24, 1964, with annotation thereon “PRI 1”; delivered 11 days later.
(18) Shipment of one trailer, total weight of 16,490 pounds, from Dyess AFB, Texas, to Torrance, California, a distance of about 1,227 miles, tendered on GBL issued March 6,1964, with annotation thereon “IPD 02”; offered for delivery 4 days later.
(19) Shipment of one vehicle, freight auto, total weight of 15,907 pounds, from Defense, Texas, to Oakland, California, a distance of about 1,874 miles, tendered on GBL issued July 8,1964, with annotation thereon “Deadline Date at Port 12 July 64”; offered for delivery 3 days later.
(20) Shipment of air coolers, O/T, water evaporative type, total weight of 5,320 pounds, from Kelly AFB, Texas, to Luke AFB, Arizona, a distance of about 989 miles, tendered on GBL issued August 27, 1964, with annotation thereon “PRI/1”; delivered 3 days later.
(21) Shipment of air coolers, O/T, water evaporative type, total weight of 6,940 pounds, from Kelly AFB, Texas, to Culver City, California, a distance of about 1,363 miles, tendered on GBL issued August 21, 1964, with annotation thereon “PRI/1”; delivered 3 days later.
(22) Shipment of air coolers, O/T, water evaporative type, total weight of 2,190 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued August 12, 1964, with annotation thereon “PRI 2”; delivered 6 days later.
(23) Shipment of machines, NOI, S.U., total weight of 1,900 pounds, from Kelly AFB, Texas, to Alameda, Cali- *283 iornia, a distance of about 1,742 miles, tendered on GBL issued August 11, 1964, with annotation thereon “PEI 1”; delivered 5 days later.
(24) Shipment of antenna enclosures, total weight of 2,005 pounds, from Kelly AFB, Texas, to Beale AFB, California, a distance of about 1,779 miles, tendered on GBL issued July 30,1964, with annotation thereon “PBI/2”; delivered 12 days later.
(25) Shipment of motors, electric, NOI, total weight of 2,730 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued August 9, 1964, with annotation thereon “PEI 1”; delivered 4 days later.
(26) Shipment of stands, aircraft service, portable, total weight of 2,470 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued September 12,1964, with annotation thereon “PBI1”; delivered 3 days later.
(27) Shipment of stands, aircraft service, portable, and motors, electric, total weight of 7,016 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued September 13, 1964, with annotation thereon “PEI 1”; delivered 2 days later.
(28) Shipment of vehicles, motor, tractor warehouse or platform, total weight of 15,750 pounds, from Sharpe Army Depot, California, to Texarkana, Texas, a distance of about 1,821 miles, tendered on GBL issued August 26, 1964, with annotation thereon “PBI-3”; delivered 6 days later.
(29) Shipment of cowls, A/C, total weight of 4,565 pounds from McClellan AFB, California, to Ellington AFB, Texas, a distance of about 1,926 miles, tendered on GBL issued October 6, 1964, with annotation thereon “IPD 02”; offered for delivery 3 days later.
(30) Shipment of radio outfits, mounted on trailer vehicle, total weight of 17,100 pounds, from Tinker AFB, Oklahoma, to Travis AFB, California, a distance of about 1,669 miles, tendered on GBL issued October 6, 1964, with annotation thereon “PBI 1”; delivered 3 days later.
*284 (31) Shipment of vehicle, motor freight, NOI, total weight of 9,740 pounds, from Cannon AFB, New Mexico, to Walnut Ridge AFS, Arkansas, a distance of about 817 miles, tendered on GBL issued October 2,1964, with annotations “IPD 02” and “RDD 5 Oct 64”; delivered 5 days later.
(32) Shipment of tanks, aluminum, S.U., total weight of 2,170 pounds, from Kelly AFB, Texas, to Castle AFB, California, a distance of about 1,631 miles, tendered on GBL issued October 2, 1964, with annotation thereon “PRI 01”; delivered 2 days later.
(33) Shipment of aircraft with power, taken apart, total weight of 10,500 pounds, from White Sands Missile Range, New Mexico, to China Lake, California, a distance of about 865 miles, tendered on GBL issued August 31, 1964, with annotation thereon “RDD 4 Sept 64”; delivered on September 1,1964.
(34) Shipment of freight automobiles, total weight of 13,210 pounds, from Kelly AFB, Texas, to Oakland, California, a distance of about 1,742 miles, tendered on GBL issued October 13, 1964, with annotation thereon “PRI 1”; delivered 6 days later.
(35) Shipment of cranes, floor type, SU, NOI, self propelled, total weight of 893 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued October 21, 1964, with annotation thereon “PRI 1”; delivered 5 days later.
(36) Shipment of machines, NOI, SU, total weight of 3,310 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued October 10, 1964, with annotation thereon “PRI 1”; delivered 6 days later.
(37) Shipment of antenna enclosures, NOI, O/T, metal, total weight of 5,958 pounds, from Kelly AFB, Texas, to Castle AFB, California, a distance of about 1,631 miles, tendered on GBL issued July 8, 1964, with annotation thereon “PRI 1”; delivered 7 days later.
(38) Shipment of stands, aircraft service, portable, KD, total weight of 4,180 pounds, from Kelly AFB, Texas, to Mira Loma, California, a distance of about 1,318 miles, tend *285 ered on GBL issued October 3,1964, with, annotation thereon “PRI 1”; delivered 4 days later.
(39) Shipment of stands, aircraft service, portable, KD, total weight of 3,816 pounds, from Kelly AFB, Texas, to Las Cruces, New Mexico, a distance of about 612 miles, tendered on GBL issued October 31, 1964, with annotation thereon “PRI 3”; delivered 3 days later.
(40) Shipment of freight trailers, NOI, total weight of 8,360 pounds, from New Orleans, Louisiana, to White Sands Missile Range, New Mexico, a distance of about 1,115 miles, tendered on GBL issued November 3,1964, with annotation thereon “PRI 4”; delivered I days later.
(41) Shipment of machines, NOI, and stands, aircraft service, total weight of 6,320 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued October 23, 1964, with annotation thereon “PRI 1”; delivered 3 days later.
(42) Shipment of outfits, radio, mounted on trailer vehicle, total weight of 9,300 pounds, from Fort Bliss, Texas, to San Jose, California, a distance of about 1,151 miles, tendered on GBL issued November 5, 1964, with annotation thereon “RDD 9 Nov 64'”; delivered 4 days later.
(43) Shipment of machines, SU, total weight of 2,300 pounds, from Kelly AFB, Texas, to McClellan AFB, California, a distance of about 1,747 miles, tendered on GBL issued October 29, 1964, with annotation thereon “PRI 2”; delivered 6 days later.
(44) Shipment of vehicles, motor freight, NOI, total weight of 13,530 pounds, from Sheppard AFB, Texas, to Oakland, California, a distance of about 1,622 miles, tendered on GBL issued October 16, 1964, with annotations thereon “PRI 2” and “RDD: 22 Oct 64”; delivered 3 days later.
(45) Shipment of machines, metal washing, total weight of 2,500 pounds, from Kelly AFB, Texas, to Travis AFB, California, a distance of about 1,745 miles, tendered on GBL issued November 3,1964, with annotation thereon “PRI 1”; delivered 6 days later.
(46) Shipment of electrical instruments, NOI, total weight of 2,060 pounds, from Kelly AFB, Texas, to Oakland, *286 California, a distance of about 1,742 miles, tendered on GBL issued November 10,1964, with annotation thereon “PEI 3”; delivered 10 days later.
(47) Shipment of rocket parts, NOI, plastic, total weight of 8,148 pounds, from Bendbrook, Texas, to San Diego, California, a distance of about 1,300 miles, tendered on GBL issued July 31,1964, with annotation thereon “PEIOEITY #2”; picked up by carrier November 12, 1964; delivered November 15,1964.
(48) Shipment of freight automobile, total weight of 13,210 pounds, from Kelly AFB, Texas, to Oakland, California, a distance of about 1,742 miles, tendered on GBL issued October 13, 1964, with annotation thereon “PEI 1”; delivered 5 days later.
(b) With respect to the shipments referred to in this finding, the plaintiff computed and collected charges on the basis that it allegedly had been requested to perform, and had performed, expedited service or high-speed transportation in connection with the shipments. The defendant subsequently assessed and recouped alleged overcharges on the theory that the plaintiff had not been requested to perform, and had not performed, expedited service or high-speed transportation in connection with such shipments.
12. (a) The following shipments in case No. 28-70 involve the expedited service issue:
(1) Shipment of one lift truck, machinery parts, and aluminum tanks, having a total weight of 15,369 pounds, from McDill Air Force Base (“AFB”), Florida, to Davis Monthan AFB, Arizona, a distance of about 1,998 miles, tendered on GBL issued August 13,1964, with annotation thereon “IPD 02”; delivered 6 days later.
(2) Shipment of three internal combustion engines and five air compressors, having a total weight of 12,285 pounds, from Brookley AFB, Alabama, to Travis AFB, California, a distance of about 2,339 miles, tendered on GBL issued August 6, 1964, with annotation thereon of “IPD 02”; delivered 5 days later.
!(3): Shipment of one electric generator, having a total weight of 3,520 pounds, from Kelly AFB, Texas, to George *287 AFB, California, a distance of about 1,349 miles, tendered on GBL issued August 31,1964, with, annotation thereon of “PBI1”; delivered 4 days later.
■ (4) Shipment of one tractor, NOI, internal combustion, having a total weight of 11,120 pounds, from Bobina AFB, Georgia, to George AFB, California, a distance of about 2,195 miles, tendered on GBL issued August 25, 1964, with annotation thereon of “IPD 01”; delivered 6 days later.
(5) Shipment of three passenger autos, having a total weight of 7,098 pounds, from Defense, Texas, to New Orleans, Louisiana, a distance of about 402 miles, tendered on GBL issued October 7, 1964, with annotation thereon “DEADLINE DATE AT POBT 13 Oct 64”; delivered 1 day later.
i (6) Shipment of three passenger autos, having a total weight of 7,098 pounds, from Defense, Texas, to New Orleans, Louisiana, a distance of about 402 miles, tendered on GBL issued October 7, 1964, with annotation thereon “DEADLINE DATE AT POBT 13 Oct 64”; delivered 2 days later.
(7) Shipment of three passenger autos, having a total weight of 7,098 pounds, from Defense, Texas, to New Orleans, Louisiana, a distance of about 402 miles, tendered on GBL issued October 7, 1964, with annotation thereon “D/L At POBT 13 Oct 64”; delivered 2 days later.
(8) Shipment of three passenger autos, having a total weight of 7,098 pounds, from Defense, Texas, to New Orleans, Louisiana, a distance of about 402 miles, tendered on GBL issued October 7, 1964, with annotation thereon “D/L At POBT 13 Oct 64”; delivered 2 days later.
(9) Shipment of three passenger autos, having a total weight of 7,320 pounds, from Defense, Texas, to Oakland Army Terminal, California, a distance of about 1,874 miles, tendered on GBL issued September 3, 1964, with annotation thereon “DEADLINE DATE AT PORT 11 SEP 64”; delivered 5 days later.
(10) Shipment of three passenger autos, having a total weight of 7,320 pounds, from Defense, Texas, to Oakland Army Terminal, California, a distance of about 1,874 miles, tendered on GBL issued September 3,1964, with annotation *288 thereon “DEADLINE DATE 11 SEP 64”; delivered 5 days later.
(11) Shipment of machines, NOI, SU, having a total weight of 7,860 pounds, from Kelly AFB, Texas, to Naval Air Station, Alameda, California, a distance of about 1,779 miles, with a stop-in-transit to partially unload at Edwards AFB, California, tendered on GBL issued October 8, 1964, with annotation thereon “PEI 1”; delivered 4 days later.
(12) Shipment of trailer-mounted water purification equipment, having a total weight of 16,800 pounds, from Orlando, Florida, to Marine Corps Supply Center, Barstow, California, a distance of about 2,417 miles, tendered on GBL issued September 2, 1964, with annotation thereon “TP :4”; picked up by carrier September 25,1964; delivered October 2, 1964.
(13) Shipment of trailer-mounted water purification equipment, having a total weight of 16,800 pounds, from Orlando, Florida, to Marine Corps Supply Center, Barstow, California, a distance of about 2,417 miles, tendered on GBL issued September 2,1964, with annotation thereon “TP: 4”; picked up by carrier September 23,1964; delivered October 2, 1964.
(14) Shipment of trailer-mounted water purification equipment, having a total weight of 16,800 pounds, from Orlando, Florida, to Marine Corps Supply Center, Barstow, California, a distance of about 2,417 miles, tendered on GBL issued September 2,1964, with annotation thereon “TP: 4”; picked up by carrier September 25,1964; delivered October 2, 1964.
(b) The statement set out in finding 11(b) is also applicable to the shipments referred to in this finding 12.

III. The Yolume Shipment Issue

13. The primary issue to be determined here is whether the defendant is entitled to lower volume rates on a series of shipments where the Government bills of lading were (for the most part) cross-referenced in accordance with para *289 graph 214018 of DSAR Regulation 4500.3, which provided in part as follows:
214013 Use of Bill of Lading for Shipments Requiring More Than One Unit of Transportation Equipment, a. One Bill of Lading. When a volume shipment requiring the use of more than one unit of transportation equipment is tendered to a carrier at one time as available for transportation and the necessary information such as receipt by carrier, certificate of delivery by consignee, and other data, can be shown on a single bill of lading, only one bill of lading is required for the entire shipment. The number of each unit of equipment and the quantity of freight loaded in or on each unit must be shown on the bill of lading.
p. More Than. One Bill of Lading. When a volume shipment requiring the use of more than one unit of transportation equipment is tendered to a carrier at one time as available for transportation, and more than one bill of lading is required to provide the necessary evidence of receipt by the carrier, delivery to consignee, and other data, each bill of lading so issued, will, for the purpose of protecting the volume rate which applies, be cross-referenced to indicate clearly that it covers a portion of a volume shipment subject to the volume rate which applies to the entire shipment. When planning for shipments under the foregoing provisions, the number of cross-referenced bills of lading covering a volume shipment should be held to a minimum; however, sufficient tonnage to meet the volume minimum weight requirements should be tendered at one time in order to protect the volume rate.
_ o. Oross-Beferencing. The first and each succeeding bill of lading covering a portion of volume shipment will be cross-referenced as follows:
(1) FIRST BILL OF LADINO ISSUED TO COYER PORTION OF VOLUME SHIPMENT TENDERED CARRIER_COMPRISING (Date) APPROXIMATELY_POUNDS.
(2) SECOND (and succeeding) BILL OF LADING ISSUED TO COVER PORTION OF VOLUME SHIPMENT TENDERED CARRIER_ (Date) COMPRISING APPROXIMATELY_ POUNDS, THE FIRST PART OF WHICH MOVED ON BILL(S) OF LADING NO(S).
(Symbol and serial number and date)
*290 (3) FINAL BILL OF LADING ISSUED TO COYEE EEMAINDEE OF A VOLUME SHIPMENT TENDEEED CAEEIEE_COM-(Date) PEISING ___ POUNDS, THE FIRST PART OF WHICH MOVED ON BILL(S) OF LADING NO(S).
(Symbol and serial number and date)
14. (a) Item 270 of the plaintiff’s Tender No. 50, I.C.C. No. 85, and its reissue under the same item number in the plaintiff’s Tender 50A, I.C.C. No. 101, provided in part as follows:
DEFINITION 03? A SHIPMENT
Except as otherwise provided, a shipment is a lot of freight received from one shipper at one point of origin at one time, for one consignee at one destination, and covered by one bill of lading. * * *
(b) The same definition appeared in Item 560 of the plaintiff’s Tariff 2-E, MF-I.C.C. No. 15.
(c) The only exceptions to the definition quoted in this finding related to stop-in-transit privileges and split pickup and delivery privileges, none of which is applicable to the shipments involved in the present litigation.
15. (a) Except as indicated in paragraphs (b) and (c) of this finding, the volume shipment issue in the present litigation arose out of situations in which a military installation issued two or more Government bills of lading to the same carrier on the same day to cover the movement to the same consignee at the same location of a quantity of material requiring a number of separate vehicles corresponding to the number of GBL’s, with the 1st GBL in the series stating that it was the 1st bill of lading issued to cover a portion of a volume shipment, with each other GBL in the series indicating its proper place in the sequence (2nd 'bill, 3rd bill, etc.) and containing a cross-reference to the bill or bills preceding it, and with the last GBL in the series containing the statement that it was the final bill of lading issued to cover the remainder of a volume shipment.
*291 (b)' Except for the 25 volume shipment claims in case No. 194-69 which have been agreed upon by the parties, and the claims arising out of transactions similar to the typical one described in paragraph (a) of this finding, the volume shipment claims in case No. 194-69 arose out of the following transactions:
(1) The defendant issued three GBL’s on February 14, 1966, four GBL’s on February 15, 1966, and one GBL on February 16,1966, to cover the movement of guns, NOI, from Ft. Chaffee, Arkansas, to Ft. Sill, Oklahoma. The GBL’s were numbered 0-4327136-10 and C-4327261-63. None of the first five GBL’s contained any sort of reference to any other bill; the sixth bill stated that it was the 6th bill, and it contained a cross-reference to the five preceding bills; the seventh bill stated that it was the 7th bill, and it contained a cross-reference to the six preceding bills; and the eighth bill stated that it was the final bill, and it contained a cross-reference to the seven preceding bills.
(2) The defendant issued two GBL’s on May 18, 1966, two GBL’s on May 20, 1966, and three GBL’s on May 23, 1966, to cover the movement of freight trailers from Tooele, Utah, to Long Beach, California. GBL C-7954388, which is not directly involved in the present litigation, stated that it was the first bill issued to cover a portion of the movement; GBL C-7954389 stated that it was the second bill issued to cover a portion of a volume shipment, and it contained a cross-reference to C-7954388; GBL C-7954489 stated that it was the 3rd bill, and it contained a cross-reference to the two bills previously mentioned in this subparagraph; GBL C-7954490 stated that it was the 4th bill, and it contained a cross-reference to the three bills previously mentioned; GBL C-7594609 stated that it was the 5th bill, and it contained a cross-reference to the four bills previously mentioned; GBL C-7594610 stated that it was the 6th bill, and it contained a cross-reference to the five bills previously mentioned; and GBL C-7954611 stated that it was the 7th bill, and it contained a cross-reference to the six bills previously mentioned.
(c) Except for the volume shipment claims arising out of transactions similar to the typical one described in para *292 graph (a) of this finding, the volume shipment claims in case No. 28-70 arose out of the following transactions:
(1) The defendant issued one GBL on October 25, 1965, two GBL’s on October 26, 1985, one GBL on October 28, 1965, and one GBL on October 29, 1965, each covering the movement of two vehicles from Tooele Army Depot, Utah, to Lake City, Missouri. The first GBL, C-7804427, did not contain any indication that it was related in any way to the other GBL’s mentioned in the preceding sentence. However, the second bill stated that it was the 2nd bill, and contained a cross-reference to C-7804427; the third bill stated that it was the 3rd bill, and contained a cross-reference to the two other bills previously mentioned; the fourth bill stated that it was the 4th bill, and contained a cross-reference to the three bills previously mentioned; and the fifth bill stated that it was the final bill to cover a volume, shipment, and contained a cross-reference to C-7804427.
(2) The defendant issued one bill of lading on December 1, 1965, and another on December 6,1965, each covering the movement of five reels of wire rope from Ft. Irwin, California, to Tooele Army Depot, Utah. The first bill, C-3942144, stated that it was the 1st bill issued to cover a portion of a volume shipment; and the second bill, C-3942151, contained a cross-reference to C-3942144.
(3) The defendant issued three GBL’s, B-7046185-87, covering the movement of freight trueles from New Orleans, La., to Tooele Army Depot, Utah. The first GBL is not directly involved in the present litigation. The second GBL was issued on December 2, 1965; stated that it was the 2nd bill, and contained a cross-reference to the first bill. The third bill was issued on December 3, 1965, and contained a cross-reference to the first and second bills.
(4) The defendant issued two GBL’s, each covering the movement of one truck from Ft. Huachuca, Arizona, to Lathrop, California. GBL C-7848368 was issued on April 6, 1966, and stated that it was the 1st bill issued to cover a portion of a volume shipment. GBL C-7848370 was issued on April 7, 1966, stated that it was the final bill, and contained a cross-reference to C-7848368.
*293 (5) The defendant issued eight GBL’s, each covering the movement of three vehicles from Tooele Army Depot, Utah, to Indiantown Gap Military Reservation, Pennsylvania. The first GBL stated that it was the 1st bill issued to cover a portion of a volume shipment; each bill in the series (except the first) contained a cross-reference to the preceding bill or bills; and each bill indicated its proper place in the sequence (except that the 4th bill incorrectly indicated that it was the “Final Bill”). However, six of the GBL’s were issued on May 17, 1966, one was issued on May 18, 1966, and one was issued on May 19,1966.
(6) On May 18, 1966, the defendant issued GBL C-7954388, which covered the movement of three trailers from the Deseret Depot Activity, Utah, to Long Beach, California, and stated that it was the 1st bill of lading issued to cover a portion of a volume shipment. On May 23, 1966, the defendant issued two GBL’s, C-7954612 and C-7954617, each covering the movement of three trailers between the points previously mentioned in this subparagraph. GBL C-7954612 stated that it was the 8th bill, and contained a cross-reference to C-7954388 and another GBL that had been issued on May 18, 1966, to two GBL’s that had been issued on May 20, 1966, and to three GBL’s that had been issued on May 23, 1966. GBL C-7954617 stated that it was the 9th bill, and contained a cross-reference to the eight GBL’s mentioned in the preceding sentence, including C-7954612. On May 25, 1966, the defendant issued GBL C-7954745, which covered the movement of three trailers from the Deseret Depot Activity, Utah, to Long Beach, California, stated that it was the final bill, and contained a cross-reference to the nine GBL’s previously mentioned. Only the four GBL’s enumerated in this subparagraph are involved in the present litigation.
(7) On June 27, 1966, the defendant issued four GBL’s, C-8009149-52, covering the movement of commodities from Van Nuys, California, to Tooele Army Depot, Utah. GBL C-8009149 covered one vehicle, and stated that it was the 1st bill issued to cover a portion of a volume shipment. GBL C-8009150 covered one vehicle, stated that it was the 2nd *294 bill, and contained a cross-reference to C-8009149. GBL C-8009151 covered one vehicle, stated that it was the 3rd bill, and contained a cross-reference to the two preceding bills in the sequence. GBL C-8009152 covered instruments, stated that it was the 4th bill, and contained a cross-reference to the three preceding bills in the sequence. On June 28, 1966, the defendant issued three GBL’s to cover the movement of commodities from Van Nuys, California, to Tooele Army Depot, Utah. GBL C-8009153 covered antennae, stated that it was the 5th bill, and contained a cross-reference to the four bills previously mentioned in this subparagraph. GBL C-8009154 covered antennae, stated that it was the 6th bill, and contained a cross-reference to the five bills previously mentioned in this subparagraph. GBL C-8009155 covered one vehicle, stated that it was the 7th and final bill, and contained a cross-reference to the six bills previously mentioned in this subparagraph.
(8)' On September 8, 1966, the defendant issued GBL C-8043587, which covered the movement of three guns from Beaumont, Texas, to Tooele Army Depot, Utah, and stated that it was the 1st bill of lading issued to cover a portion of a volume shipment. On September 12,1966, the defendant issued GBL C-8043588, which covered the movement of three guns between the points previously mentioned in this subparagraph, stated that it was the 2nd bill, and contained a cross-reference to C-8043587. On September 13, 1966, the defendant issued GBL C-8043589, which covered the movement of three guns between the points previously mentioned, stated that it was the final bill, and contained a cross-reference to C-8043587 and C-8043588.
(9) On September 13, 1966, the defendant issued GBL C-8043590, which covered the movement of three guns from Beaumont, Texas, to Tooele Army Depot, Utah, and stated that it was the 1st bill of lading to cover a portion of a volume shipment. On September 14, 1966, the defendant issued GBL C-8043591, which covered the movement of three guns between the points previously mentioned in this sub-paragraph, stated that it was the 2nd bill, and contained a cross-reference to C-8043590. On September 23, 1966, the *295 defendant issued GBL C-8043592, which covered the movement of three guns between the points previously mentioned, stated that it was the 3i’d bill, and contained a cross-reference to the two bills previously mentioned in this subparagraph. On September 23,1966, the defendant issued GBL C-8043593, which covered the movement of three guns between the points previously mentioned, stated that it was the 4th bill, and contained a cross-reference to the three bills previously mentioned. On September 23, 1966, the defendant issued GBL C-8043594, which covered the movement of three guns between the points previously mentioned, stated that it was the 5th bill, and contained a cross-reference to the four bills previously mentioned. On September 26,1966, the defendant issued GBL C-8043595, which covered the movement of three guns between the points previously mentioned, stated that it was the final bill, and contained a cross-reference to GBL’s C-8043590-93.
(10) On September 27, 1966, the defendant issued GBL 08043596, which covered the movement of three guns from Beaumont, Texas, to Tooele Army Depot, Utah, and stated that it was the 1st bill of lading issued to cover a portion of a volume shipment. On September 27,1966, the defendant issued GBL C-8043565, which covered the movement of three guns between the two points previously mentioned in this sub-paragraph, stated that it was the 2nd bill, and contained a cross-reference to C-8043596. On September 27, 1966, the defendant issued GBL C-8043566, which covered the movement of three guns between the points previously mentioned, stated that it was the final bill, and contained a cross-reference to the two bills previously mentioned in this subparagraph.
(11) The defendant issued six GBL’s, D-2846479-84, each covering the movement of one vehicle from Defense, Texas, to Ft. Irwin, California. The first GBL in the series stated that it was the 1st bill issued to cover a portion of a volume shipment; each bill indicated its proper place in the sequence, with D-2864484 stating that it was the final bill; and each bill, except the first, contained a cross-reference to the preceding bill or bills in the sequence. However, the first four *296 bills were issued on October 9,1966, and the last two bills were issued on October 10, 1966.
(12) On December 12, 1966, the defendant issued GBL D-29399B8, which covered the movement of a vehicle, radio repair, from New Orleans, Louisiana, to Ft. Bliss, Texas, and stated that it was the 1st bill of lading issued to cover a portion of a volume shipment. On December 15,1966, the defendant issued GBL D-2939941, which covered the movement of a vehicle, radio repair, between the two points previously mentioned in this subparagraph, stated that it was the 4th and final bill, and contained a cross-reference to D-2939938. (The record does not contain any evidence concerning a 2nd bill or a 3rd bill.)
(d) The several GBL’s referred to in paragraph (a) of this finding, in each separate subparagraph of paragraph (b), and in each separate subparagraph of paragraph (c), together with the transportation under such GBL’s, were treated by the defendant as constituting a single volume shipment carrying the volume rate for the purpose of assessing and recouping alleged overcharges, whereas the plaintiff had previously treated each movement under each GBL as constituting an alleged separate shipment for the purpose of computing and collecting a transportation charge.
Conclusion or Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover on its expedited sendee claims (1), (4), (6), (7), (9) — (12), (16), (18)-(21), (23), (25)-(27), (29), (30), (32), (33), (35), (38), (39), (41), (42), (44), and (48) set out in subparagraph (b) of paragraph VI of the petition in case No. 194-69; on its expedited service claims (2), (3), and (11) set out in subparagraph (b) of paragraph VI of the petition in case No. 28-70; on its volume shipment claims (l)-(25) and (31)-(38) set out in paragraph XII of the petition in case No. 194-69; and on its volume shipment claims (18)-(22) set out in paragraph XII of the petition in *297 case No. 28-70; and judgment is entered to that effect. Tlie amounts of tbe recoveries will be determined in subsequent proceedings under E,ule 131 (c).
The court further concludes as a matter of law that the plaintiff is not entitled to recover on the other claims asserted in the present litigation, and the respective petitions are dismissed as to such claims.
In accordance with the opinion of the court, a stipulation of the parties, and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on November 3, 1972 that judgment for the plaintiff be entered for $8,390.57 in Case No. 194-69 and for $1,516.90 in Case No. 28-70.